REVISED - August 4, 1999

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 98-50810

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SERGIO ALBERTO ORTEGON-UVALDE, a.k.a. Sergio Garcia-Leal,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Texas

July 1, 1999

Before SMITH, DeMOSS, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

After a bench trial, Defendant-Appellant Sergio Alberto Ortegon-Uvalde ("Ortegon") was convicted of illegal reentry into the United States, after having been deported after a conviction for an aggravated felony, in violation of 8 U.S.C. § 1326(b)(2) (1994). On appeal, Ortegon advances two challenges to his conviction. First, he contends that the government must prove specific intent when prosecuting a violation of § 1326. Second, he argues that he was entitled to a defense of entrapment-by-estoppel because he was misled about the time that he had to remain absent from the United States. For the reasons set forth below, we decline to accept Ortegon's arguments and thus affirm.

## FACTUAL & PROCEDURAL BACKGROUND

On June 6, 1989, Ortegon was convicted in state court of an aggravated felony offense – delivery of cocaine – and sentenced to eight years' imprisonment. After a hearing, Ortegon was deported from the United States to Mexico on January 29, 1990.

On June 23, 1997, Special Agent Jan Baumgardner of the Immigration and Naturalization Service ("INS") learned that Ortegon was in the Bell County Jail in Belton, Texas. Baumgardner interviewed Ortegon, and, after a records check, it was learned that Ortegon had been previously deported. On February 10, 1998, Ortegon was indicted on one count of illegal reentry into the United States in violation of § 1326(b)(2). On May 18, he waived his right to a trial by jury and proceeded to a bench trial. At trial, Ortegon stipulated to all of the underlying facts supporting the offense: he conceded that he had been previously convicted of a drug offense in 1989, that he had been deported in 1990 to Mexico, and that he was found in the United States, without permission of the Attorney General, in June 1997.

The major issue at trial was whether the warning given to Ortegon when he was deported permitted him the defense of entrapment-by-estoppel. The defendant testified that when he was deported in 1990, he "was told"[1] that he could not return to the United States until 1995. A written warning provided Ortegon at the time of his deportation advised:

> This is a warning. Please read carefully.
> It has been ordered that you be deported to Mexico. You will be informed when departure arrangements are complete. If needful, we will assist you as much as possible arranging your personal affairs for departure.
>
> Should you wish to return to the United States you must write this office or the American Consular Office nearest your residence abroad as to how to obtain permission to return after deportation. By law (Title 8 of the United States Code, Section 1326) any deported person who within five years returns without permission is guilty of a felony. If convicted he may be punished by imprisonment of not more than two years and/or a fine of not more than $1,000.00.[2]

Ortegon maintained that he had relied on this language and that he believed he could return to the United States after 1995. On direct examination, he insisted that he had returned to the United States

---

[1]Although Ortegon used the words "was told," he does not indicate who told him this. It appears that he relied on the warnings in the papers from the INS.

[2]Both parties agree that this language is incorrect. Under §1326, it is a crime to reenter the United States at any time after deportation without permission, and the actual potential sentence is 20 years.

after 1995. On cross-examination, however, Ortegon admitted that he had actually been in the United States continuously since 1991.[3]

Before the trial and during closing arguments, Ortegon presented a motion for a judgment of acquittal. The court took the matter under advisement, but on May 20, 1998, it found Ortegon guilty of violating § 1326 and sentenced him to 92 months' imprisonment and a three-year term of supervised release. Ortegon filed a timely notice of appeal.

## DISCUSSION

### I

Ortegon first argues that this court should require the government to prove specific intent under § 1326. He admits that intent is not specifically set forth in the statute. He points out, however, that criminalizing conduct normally requires some level of intent. He maintains that cases in which no *mens rea* is required are limited generally to statutes regulating dangerous devices or harmful waste materials. Ortegon alleges that the crime with which he was charged is not a public welfare offense, in which the interest of society as a whole may outweigh the need for the individual to act with specific intent. Additionally, Ortegon points out that this is a crime subject to harsh penalties, which should justify a specific intent requirement. Finally, Ortegon argues that people would not normally expect that punishment for an illegal border crossing could mean 20 years in prison. Given these factors and his perception that the INS continues to misstate the elements of illegal reentry to deported aliens, Ortegon contends that a specific intent requirement should be imposed.

Ortegon's argument is not without force; indeed, one circuit has adopted his view. See United States v. Anton, 683 F.2d 1011 (7th Cir. 1982). Every other circuit to consider the issue,

_____

[3]Ortegon was evasive with the trial court when he was asked when he had returned to the United States during his bench trial. He first stated that he had not returned to the United States until after 1995. After reasserting this on cross-examination, he was asked whether he understood the meaning of perjury. Ortegon then stated that he did not see why he should have to answer whether he had returned to the United States before or after 1995 because he was not questioned by the INS until 1997. Only after the court ordered him to answer did he admit that he had returned before 1995.

3

however, has taken the contrary position. See United States v. Gonzalez-Chavez, 122 F.3d 15, 17-18 (8th Cir. 1997); United States v. Henry, 111 F.3d 111, 114 (11th Cir. 1997); United States v. Soto, 106 F.3d 1040, 1041 (1st Cir. 1997); United States v. Ayala, 35 F.3d 423, 426 (9th Cir. 1994); United States v. Espinoza-Leon, 873 F.2d 743, 746 (4th Cir. 1989); United States v. Hernandez, 693 F.2d 996, 1000 (10th Cir. 1982); United States v. Newton, 677 F.2d 16, 17 (2nd Cir. 1982); United States v. Hussein, 675 F.2d 114, 116 (6th Cir. 1982). In fact, as Ortegon concedes, a panel of this circuit has confronted this very issue and adopted the majority approach. See United States v. Trevino-Martinez, 86 F.3d 65, 68 (5th Cir. 1996). In Trevino-Martinez, we held that a showing of specific intent was not required to find an individual guilty under § 1326. See 86 F.3d at 68; see also United States v. Asibor, 109 F.3d 1023, 1036 (5th Cir. 1997). As a panel, we are without authority to overrule the decision of another panel of this circuit. See United States v. Taylor, 933 F.2d 307, 313 (5th Cir. 1991). Accordingly, Ortegon's effort to change the law of this circuit is appropriate only in a motion for rehearing *en banc*.

## II

Ortegon also argues that he was entitled to claim the defense of entrapment-by-estoppel. In essence, he contends that the government's warning led him mistakenly to believe that he could reenter the United States after five years without fear of prosecution. Because he was charged with illegal entry in 1997, more than five years after his 1990 deportation, Ortegon submits that his prosecution was invalid. Because the district court erred in considering the fact that he entered the country before 1995, Ortegon maintains that he should be acquitted of his crime and released from his sentence. He further maintains that the government cannot rely on the fact that he entered the United States before 1995 because he was not charged with illegal conduct in those years. Finally, he argues, without support, that while a citizen of the United States might be presumed to know and understand the laws of this country, no such presumption should apply to a citizen of Mexico.[4]

---

[4]Ortegon cites United States v. Spires, 79 F.3d 464 (5th Cir. 1996), for this proposition. While Spires discusses the defense of entrapment-by-estoppel, it does not raise the issue of presumed legal knowledge. See id. at 466-67.

"The [entrapment-by-estoppel] defense applies when a government official tells a defendant that certain conduct is legal and the defendant commits what would otherwise be a crime in reasonable reliance on the official's representation." United States v. Baptista-Rodriguez, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994). "The estoppel argument was held to establish a valid defense in Cox v. Louisiana, 379 U.S. 559 . . . (1965) and Raley v. Ohio, 360 U.S. 423 . . . (1959)." United States v. Bruscantini, 761 F.2d 640, 641 (11th Cir. 1985).[5] The district court considered this defense when it took Ortegon's case under advisement. It looked to the fact that Ortegon returned to the United States shortly after he was deported and did not again return to Mexico before his 1997 incarceration. The court found that Ortegon's actions evidenced "extreme bad faith" because he returned to the United States so early despite the warning that was given him.

We review *de novo* the district court's application of constitutional standards to Ortegon's claim. See United States v. Perez-Torres, 15 F.3d 403, 406 (5th Cir. 1994) (citing United States v. Shaw, 920 F.2d 1225, 1228 (5th Cir. 1991)). This is not the first time we have had to consider the entrapment-by-estoppel defense in the context of erroneous INS warnings. In Perez-Torres, the defendant argued that his sentence of 60 months was improper because the INS warning mistakenly stated that the potential sentence for illegal reentry was two years. See 15 F.3d at 405-06. We observed there that "'[e]stoppel is an equitable doctrine.'" Id. at 407 (quoting Heckler v. Community Health Services of Crawford County, Inc., 467 U.S. 51, 59 & n.12 (1984)). Consequently, "he who comes into equity must come with clean hands, and thus the doors of equity are closed to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may

---

[5]In Raley, the petitioners were convicted of contempt for refusing to answer questions before the Unamerican Activities Commission of the State of Ohio. See Raley, 360 U.S. at 424. The Commissioner advised them, contrary to Ohio law, that they had a right to claim their privilege against self incrimination. See id. at 425. The Supreme Court held that it was "an indefensible sort of entrapment by the State -- convicting a citizen for exercising a privilege which the State had clearly told him was available to him." Id. at 425-26.

In Cox, the petitioner had received permission to hold a demonstration across the street from a courthouse but was later arrested for refusing to disperse. See 379 U.S. at 570-71. The Court held that a conviction under such circumstances violated the Due Process Clause. See id. at 571-72.

5

have been the behavior of the other party." Id. (internal quotation marks omitted) (quoting Precision Instrument Mfg. Co. v. Automotive M.M. Co., 324 U.S. 806 (1945)).

Ortegon cannot avail himself of the entrapment-by-estoppel defense because he did not actually rely on the INS' erroneous warning. Ortegon admitted on cross-examination that he reentered the United States within five years and remained undetected until he was discovered on June 23, 1997. Ortegon's actions in returning to the United States within five years of his deportation contradict his assertion that he reasonably relied on the INS warning, and critically undermines his argument that he thought he could return after five years without committing a felony. Moreover, we decline Ortegon's invitation to introduce a perverse incentive for deported persons to remain in the United States in violation of their deportation order simply because they manage to go undetected outside the "ambiguous" five years expressed in the warning. Accordingly, we reject Ortegon's second basis for relief as well.

## CONCLUSION

For the reasons set forth above, we AFFIRM Ortegon's conviction.